UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,


        -against-                            19-cr-536 (PKC)


                                                  OPINION
                                                  <u>AND ORDER</u>

OMAR LOPEZ CASTRO,

                        Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.

        Defendant Omar Lopez Castro moves for a judgment of acquittal or, alternatively, a new trial, pursuant to Rules 29 and 33, Fed. R. Crim. P.  He was convicted at trial of conspiracy to distribute and possess with the intent to distribute more than five kilograms of cocaine.  (ECF 484.)  Co-conspirators were alleged to have shipped cocaine concealed within large pieces of furniture from Puerto Rico to the continental United States.  Defendant was alleged to be the owner of more than $8 million of cocaine in three of those shipments.

        Defendant asserts that he is entitled to a judgment of acquittal under Rule 29(c) because the evidence presented at trial was insufficient to sustain a conviction.  He also argues that he is entitled to a new trial under Rule 33 on the grounds that his prior conviction for drug trafficking was inadmissible, the verdict was against the weight of the evidence, and his constitutional and statutory rights to a speedy trial were violated.  For reasons that will be explained below, defendant's motions will be denied.

PROCEDURAL HISTORY

Prior to trial, defendant moved to dismiss the indictment against him, arguing that his right to a speedy trial had been violated under both the Speedy Trial Act and the Sixth Amendment.  (ECF 447; ECF 473 at Tr. 2-5.)  The Court took up this motion at the final pretrial conference and, in its bench ruling, explained why time had been properly excluded and no constitutional violation had transpired.  (ECF 473 at Tr. 6-20.)

Defendant had been arrested on a criminal complaint on September 1, 2022, and trial commenced one year and two months later, on November 6, 2023.  The jury returned a guilty verdict against him on November 13, 2023 on a single count of conspiracy to distribute a controlled substance.  (ECF 484; ECF 493 at Tr. 621-23.)  The jury found the controlled substance was cocaine and the quantity was in excess of five kilograms.  (ECF 484.)

Defendant retained new attorneys who filed notices of appearance on January 8, 2024.  (ECF 506.)  On January 22, 2024, the new attorneys asked the Court to extend defendant's time to file Rule 29 and Rule 33 motions.  (ECF 510.)  The Court denied this application without prejudice and asked counsel to submit support for the Court's authority to extend the time limit for these motions because trial counsel had not moved under Rule 29 at the close of the government's case, the entire case, or after verdict and did not file a Rule 33 motion after verdict; therefore, the filing of these motions 60 days after trial appeared untimely.  (ECF 493 at Tr. 626-28; ECF 491 at Tr. 489-98; ECF 511.)  Counsel duly filed the requested submission.  (ECF 513.)  On February 2, 2024, the Court extended defendant's time to file Rule 29 or Rule 33 motions to April 2, 2024 "for good cause shown arising from the change in counsel."  (ECF 514 at 5.)[1]

---

[1] Defense counsel submitted authority for the proposition that a court may, upon a finding of excusable neglect, extend the time for a filing under Rules 29 and 33 even after the expiration of the deadline for filing.  There was an ample basis for a finding of excusable neglect, even though the delay was within the control of the defense, because the delay in filing occurred because of the change of counsel, counsel acted in good faith, there was no prejudice to

Counsel subsequently requested another extension of time until April 18, 2024, to which the government did not object; the Court granted this extension as well.  (ECF 527, 529.)  A second request for an extension of time to April 29, 2024 was also granted.  (ECF 542, 543.)

I.    DISCUSSION

    A.  The Evidence Against Defendant Was More
         Than Sufficient To Support a Conviction.

Defendant argues that the evidence was not sufficient to convict him and thus requires his acquittal under Rule 29(c).  (ECF 547 at 2, 27.)  The government cites the "[v]ast" amount of evidence that supported his conviction, including the testimony of witnesses, shipping records, DEA surveillance, and cell phone messaging records.  (ECF 563 at 1 n.1.)

In reviewing a Rule 29(c) motion, the court "must view the evidence 'in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government.'"  United States v. Anderson, 747 F.3d 51, 60 (2d Cir. 2014) (quoting United States v. Persico, 645 F.3d 85, 104 (2d Cir. 2011)).  A court must also "defer[ ] to the jury's evaluation of the credibility of witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence."  United States v. Jones, 482 F.3d 60, 68 (2d Cir. 2006) (citations omitted).  See also United States v. Florez, 447 F.3d 145, 156 (2d Cir. 2006) ("We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge.").  "[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (internal

---

the government, and the length of the delay was not substantial and did not prejudice the proceeding, particularly in view of the completion of the trial.  See United States v. Hooper, 9 F.3d 257, 259 (2d Cir. 1993) (citing Pioneer Investment Services Company v. Brunswick Associates Ltd. Partnership, 507 U.S. 380, 395 (1993)).

quotation marks and citations omitted).  The court must deny the motion "if <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Anderson</u>, 747 F.3d at 59 (quoting <u>United States v. Aguilar</u>, 585 F.3d 652, 656 (2d Cir. 2009)).

Based upon the record as a whole and drawing all reasonable inferences in the government's favor, the Court comfortably concludes that a rational jury could find that the government proved the essential elements of the crime by proof beyond a reasonable doubt.

At trial, the government called a New York Police Department officer who responded to a call about a possible emotionally disturbed person.  (ECF 485 at Tr. 27-28.) When he arrived at the scene, an apartment on Bryant Avenue in the Bronx, he was alerted that the call was actually about a robbery in progress.  (<u>Id.</u> at Tr. 29.)  Upon entering the apartment, he encountered a female who appeared to be in shock and two children crying.  (<u>Id.</u> at Tr. 31-34.) There were broken tables scattered around the otherwise empty apartment.  One of the broken tables had a hammer in it.  (<u>Id.</u> at Tr. 32-33.)  The officer later discovered a wrapped package of white powder in front of the apartment.  (<u>Id.</u> at Tr. 35-36.)  The stipulated lab results indicated that this package contained approximately 877 grams of cocaine.  (<u>Id.</u> at Tr. 38-40.)

An agent of the Bureau of Alcohol, Tobacco and Firearms testified to his activities at a DHL facility in Orlando, Florida.  (ECF 487 at Tr. 47-50.)  In the facility, he observed parcels in shrink wrap large enough to contain coffee tables.  (<u>Id.</u> at Tr. 51-52.)  He obtained a federal search warrant and discovered that inside the parcels were tables, and inside the tables were packages of what later was shown to be powdered cocaine.  (<u>Id.</u> at Tr. 50-53, 58-59.)  The cocaine inside the tables was approximately 65 kilograms in weight.  (<u>Id.</u> at Tr. 56, 58.)  There were two other parcels of similar size that were also seized.  (<u>Id.</u> at Tr. 58.)  He and fellow agents thereafter arranged a controlled delivery of two of the parcels.  (<u>Id.</u> at Tr. 59-62.)  Upon arresting

the individual who signed for the parcels, the agents discovered at his home straps that were similar in size and color to those that had been used on the two parcels. (Id. at Tr. 65-67.) They also recovered from the home a coffee table with a hole in the bottom where material could have been stored. (Id. at Tr. 67-70.) Later, ATF agents searched the other two parcels, and in total, the three parcels contained 192 bricks weighing approximately one kilogram each. (Id. at Tr. 71-75.)

Pedro Guzman Martinez, a government cooperator, testified that he trafficked in cocaine loaded into furniture from 2018 to 2021 and in the course of those activities, approximately 4,500 kilograms were shipped from Puerto Rico to the continental United States. (Id. at Tr. 98-100.) Guzman testified that the larger conspiracy, including the period predating defendant's involvement, included about 20 persons and over 20 shipments. (Id. at Tr. 104.) Guzman testified that the cocaine originated from the Dominican Republic, Panama, and St. Thomas and was sent to Puerto Rico for transshipment to the continental United States. (Id. at Tr. 105-06.) He explained how cocaine was packed in the furniture and shipped to locations on the East Coast of the United States, and he identified those involved. (Id. at Tr. 108-30.) He testified about how the Bronx robbery affected him and other members of the conspiracy. (Id. at Tr. 138-45.)

Guzman identified defendant, whom he knew as "Cache," as a participant in the drug trafficking scheme with whom he dealt directly. (Id. at Tr. 100-02.) Defendant owned the cocaine, and Guzman supplied the means of shipping defendant's cocaine. (Id. at Tr. 102.) Specifically, Guzman made three shipments of cocaine for defendant in 2021, weighing 88 kilograms, 80 kilograms, and 104 kilograms. (Id.) The address for the final destination was supplied to Guzman by defendant. (Id. at Tr. 163.) The sender on the shipping documents was listed as "Tony Bruseles," an alias that Guzman testified he controlled, and the recipient was

listed as "Omar Perez Blanco." (<u>Id.</u> at Tr. 164.)  Guzman testified that the alias "Omar Perez

Blanco" was used by another co-conspirator, "Cano," who received the shipments in the United

States and that Guzman paid Cano for his role in receiving Cache's shipments. (<u>Id.</u> at Tr. 165.)

Guzman testified that he knew the shipments of Cache's cocaine had been successfully delivered

to their final locations because of confirmations from the logistics company used. (<u>Id.</u> at Tr.

170.)  The government also introduced records from the shipping companies involved that

reflected three shipments of "furniture" in 2021 sent to "Omar Perez Blanco" in the continental

United States from "Tony Bruseles." (ECF 491 at Tr. 444-45.)  Finally, the government

introduced records of communications between Guzman and defendant around the time the

shipments were made that appeared to discuss the shipments in code. (ECF 489 at Tr. 332-37;

ECF 491 at Tr. 463-76.)

Guzman met defendant through Lester Marquez, whom Guzman had known for

about 15 years. (<u>Id.</u> at Tr. 148-50.)  Guzman had engaged in drug trafficking with Lester. (<u>Id.</u> at

Tr. 149.)  Guzman testified that Lester and Cache came to know each other while they were both

in jail. (<u>Id.</u> at Tr. 150.)  A person named Sammy put Guzman in touch with Cache in late 2020

(<u>id.</u> at Tr. 149), but a reasonable inference to be drawn from the evidence is that Guzman would

never have trusted Cache, nor Cache trusted Guzman, without the crucial link of Lester.  For

example, at the first meeting between Guzman and Cache, they discussed drug trafficking

together. (<u>Id.</u> at Tr. 150.)  Cache also agreed to help Guzman to get paid for the shipment of

cocaine in the Bronx that had been the subject of the apartment robbery. (<u>Id.</u> at Tr. 151-52.)

At one point, Cache told Guzman that he was going to try to have his term of

supervised release reduced. (<u>Id.</u> at Tr. 155.)  He also told Guzman that he wanted to travel to the

Dominican Republic to meet someone regarding cocaine. (<u>Id.</u>)  To corroborate this testimony,

the government offered, and the Court received into evidence, a prior judgment of conviction of defendant, subject to a limiting instruction.  The judgment showed that defendant had been sentenced to a five-year term of supervised release with the condition that he not travel outside the district without the permission of the Court or the probation officer.  (ECF 489 at Tr. 255-56.)  Also offered and received into evidence was a docket entry stating that defendant had moved for early termination of his term of supervised release, which was denied with the direction that such an application ought to be addressed to the United States District Court for the District of Puerto Rico, the Court to which supervision had been transferred. (Id. at Tr. 257.)  The government also offered documents showing the transfer of jurisdiction to the District of Puerto Rico and the docket entry reflecting that the District of Puerto Rico granted early termination of the term of supervised release, thereby freeing defendant of the travel restriction.  (Id. at Tr. 258.)  Documentary evidence showed that defendant traveled to the Dominican Republic on two short trips following the termination of his supervised release.  (ECF 491 at Tr. 451-54.)

Cellphone extractions from Guzman's phone had listings for the shipping company in Puerto Rico from which the furniture laden with drugs was shipped and phone numbers for both Lester and Cache.  (Id. at Tr. 322-25.)  The government displayed encrypted WhatsApp text messages exchanged with Cache found on Guzman's phone showing that the two had formed a bond of trust.  (Id. at Tr. 327-31.)  The extracted messages supported the conclusion that Guzman were speaking in coded messages to avoid detection, that Guzman's confederates Robert and Erito were working on a drug shipment for defendant, and that defendant and Robert were in direct contact.  (Id. at Tr. 332-36.)  There was also evidence that defendant had deleted his chats and communications with Guzman and Robert when he learned law enforcement was investigating other members of the conspiracy.  (ECF 493 at Tr. 363-68.)

The government also offered bills of lading, emails, and invoices for the shipments of the large parcels that purportedly contained the cocaine laden furniture.  (Id. at Tr. 443-50; ECF 489 at Tr. 266-78.)  These records' description of the contents of the shipments, as measured against the testimony in the case, was false and concealed their true contents.  (See, e.g., ECF 491 at Tr. 444-45 (describing the contents of the shipments as "furniture").)

Defendant argues that the only evidence against him was Guzman's testimony.  But "[a] conviction may be sustained on the basis of the testimony of a single accomplice, so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt."  United States v. Diaz, 176 F.3d 52, 92 (2d Cir. 1999) (citation omitted).  Guzman's testimony was both credible and corroborated.  The government offered sufficient evidence for a rational jury to find that it proved beyond a reasonable doubt the existence of the cocaine distribution conspiracy, defendant's participation in the conspiracy with knowledge of its unlawful object, and all other elements of the crime.

Lopez Castro's Rule 29(c) motion will be denied.


B.  Defendant's Motion for a New Trial Will Be Denied.

Rule 33(a), Fed. R. Crim. P., provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  A motion for a new trial may be premised on errors in evidentiary rulings or instructions to the jury, or the verdict being against the weight of the credible evidence.  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." United States v. McPartland, 81 F.4th 101, 123 (2d Cir. 2023) (quoting United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001)).  "It is . . . only in exceptional circumstances, where there is 'a real concern

that an innocent person may have been convicted,' that a court 'may intrude upon the jury function of credibility assessment' and grant a Rule 33 motion." United States v. Landesman, 17 F.4th 298, 330 (2d Cir. 2021) (quoting United States v. McCourty, 562 F.3d 458, 475-76 (2d Cir. 2009)). "Because motions for a new trial are disfavored in this Circuit," however, "the standard for granting such a motion is strict[.]" United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995).

Defendant makes several arguments urging that his conviction should be vacated and a new trial granted. He argues that the fact of his prior conviction for drug trafficking in 2011 should not have been admitted into evidence and that it constituted impermissible "propensity evidence." He also argues that the fact of the prior conviction unfairly prejudiced him in the jury's eyes. Additionally, he argues that the jury's verdict was against the weight of the credible evidence because the only evidence presented against him was the testimony of Guzman, whose testimony is "inherently unworthy of deference," and that the remaining evidence at trial was circumstantial or wholly unconnected to him. (ECF 547 at 5.) Finally, he argues that he was denied a speedy trial as guaranteed by the Sixth Amendment and the Speedy Trial Act. The Court will address each argument in turn.

1.     Defendant's Prior Conviction Was Properly
        Admitted For Limited Purposes.

Under Rule 404(b), Fed. R. Evid., evidence of a prior bad act "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but can be used for "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The Second Circuit applies an "inclusionary approach" to Rule 404(b) in which "evidence of prior crimes,

wrongs, or acts 'is admissible for any purpose other than to show a defendant's criminal propensity.'" United States v. Paulino, 445 F.3d 211, 221 (2d Cir. 2006) (quoting United States v. Pitre, 960 F.2d 1112, 1118-19 (2d Cir. 1999)).

The court must first determine if the "evidence is offered for a proper purpose, one other than to prove the defendant's bad character or criminal propensity." Pitre, 960 F.2d at 1119. Second, the court must consider "if the evidence is relevant to an issue in the case." Id. If this factor is satisfied, the district court must next determine whether the "probative value is substantially outweighed by the danger of unfair prejudice." Id. Finally, the court must give appropriate limiting instructions to the jury upon request from the parties. Id.

### a.    Proper Purpose and Relevance to an Issue in the Case

Defendant's prior conviction for drug trafficking was offered for a proper purpose and was not impermissible "propensity evidence." A court may admit prior act evidence if it is used to "inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed." Id. (citing United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990)). In particular, such evidence may be offered and received "in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." United States v. Dupree, 870 F.3d 62, 76 (2d Cir. 2017) (quoting Diaz, 176 F.3d at 79). See also United States v. Basciano, 465 F. App'x 9, 14 (2d Cir. 2012) (summary order) (citation omitted) ("Admission of 404(b) evidence is entirely appropriate to explain . . . the development of criminal relationships and to illustrate that mutual trust existed between coconspirators.").

Guzman testified to the relationship of trust among Lester Marquez, defendant, and himself.  Guzman identified Lester as "a friend of Cache's and they work together."  (ECF 487 at Tr. 148.)  Guzman testified that he had known Lester "[a] little bit over 15 years," that Lester had family in the area where Guzman grew up, and that he and Lester had trafficked marijuana together about ten years prior—thus demonstrating a level of trust and history between Guzman and Lester.  (Id. at Tr. 149.)  Guzman then testified that defendant told him that he had met Lester in jail.  (Id. at Tr. 150; id. at Tr. 154-55.)

Guzman also testified that, at his first meeting in person with defendant, defendant called Lester on a "video call" to "confirm with him, to him, that we were together," which Guzman was able to hear.  (Id. at Tr. 150.)  He further testified that at that first meeting, he and defendant specifically discussed shipping cocaine to the United States, and that at their second meeting, they agreed on a specific plan in which Guzman would be paid to ship cocaine belonging to defendant.  (Id. at Tr. 150; id. at Tr. 131-32.)

Defendant's time in prison with Lester, a trusted colleague of Guzman, tended to show why it was plausible for defendant to trust Guzman to ship three multi-kilogram drug shipments for him valued at $8 million.  Defendant's 2011 drug trafficking conviction was relevant and admissible to show how defendant met Lester, why Lester trusted him, and why Lester's trust in him would have led him to trust Guzman.  (ECF 473 at Tr. 24-26.)

Defendant argues that Guzman's testimony differed from the government's proffer about his anticipated testimony before trial, and that the government elicited no evidence about Guzman's knowledge that defendant's prior conviction was for drug trafficking.  (ECF 547 at 7; see also ECF 565 at 4.)  At trial, Guzman did not explicitly testify that he believed defendant had been convicted for drug trafficking.  But that point does not negate a proper

purpose for the evidence.  As the Court ruled at the final pretrial conference (ECF 473 at Tr. 25-26), and as the Court instructed the jury several times (ECF 487 at Tr. 150-151; ECF 489 at Tr. 253-55), the fact of defendant's prior conviction for drug trafficking was offered by the government "in an effort to demonstrate the existence of a relationship of mutual trust between two alleged members of the charged conspiracy."  (ECF 487 at Tr. 150-51.)  The trust displayed between Lester and defendant was the foundation for the mutual trust between Guzman and defendant.  (ECF 489 at Tr. 253-54.)

   In a wholly separate respect, testimony about defendant's conviction corroborated Guzman's testimony.  "Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony. . . . [T]o avoid potential prosecutorial abuse, we have required the proponent of the evidence to demonstrate a close relationship between the proffered evidence and the evidence to be corroborated.  Other crimes evidence, therefore, is only admissible for corroborative purposes, if the corroboration is 'direct and the matter corroborated is significant.'"  United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987) (citations omitted); see also United States v. Torres, 2023 WL 378942, at *4 (2d Cir. Jan. 25, 2023) (summary order).

   Defendant told Guzman that he planned to have his term of supervised release terminated.  (ECF 487 at Tr. 155.)  Defendant said he wanted to travel to the Dominican Republic to discuss cocaine supplies with another individual.  (Id.)  The government pointed out to the jury that the terms and conditions of defendant's supervised release restricted out of district travel without permission.  (ECF 489 at Tr. 256.)  The jury learned from limited excerpts from court records that defendant tried twice, first in this district and with ultimate success in the District of Puerto Rico, to have his supervised release terminated.  (Id. at Tr. 257-58.)  Thereafter,

defendant did in fact make several trips to the Dominican Republic.  (ECF 491 at Tr. 454.)  This sequence of events was powerful corroboration of Guzman's testimony.[2]

Defendant's prior conviction was offered for a proper purpose and is also plainly relevant to an issue in the case: whether defendant entered into a drug trafficking conspiracy with Guzman.  Both the proper purpose and relevance prongs were satisfied.

      b.  The Probative Value Was Not Substantially Outweighed
          <u>By the Danger of Unfair Prejudice.</u>

Defendant also argues that the admission of the fact of his 2011 drug trafficking conviction "overwhelmed the jury's capacity to determine fairly whether [he] a decade later entered into an unrelated conspiracy to commit the same crime" because it unfairly prejudiced him in the jury's eyes.  (ECF 547 at 3-4.)

Under Rule 403, Fed. R. Evid., a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  As the government notes, however, the Second Circuit has allowed the admission under Rule 403(b) of prior act evidence that was not "any more sensational or disturbing" than the charged crime. <u>Roldan-Zapata</u>, 916 F.2d at 804.  (ECF 563 at 7.)  Here, the prior act at issue is the same act as the charged conduct: participation in a drug trafficking conspiracy.  No details were admitted about the prior conviction other than the fact that it was for drug trafficking, and so there was no additional information in evidence about the prior conviction that could inflame or provoke the jury's emotions more than the charged crime.  <u>See</u>, <u>e.g.</u>, <u>United States v. Massino</u>, 546 F.3d 123, 133 (2d Cir. 2008) (criticizing use of "highly inflammatory statement" rather than "memorable

---

[2] Interestingly, both at trial (ECF 487 at Tr. 92-93) and in his Rule 33 motion, defendant concedes that the fact of his early termination of supervised release was "arguably relevant to corroborate Guzman's testimony" that defendant had done so in order to be able to travel freely and resume his drug trafficking.  (ECF 547 at 6, 10.)

yet neutral (or less inflammatory) statements").  The Court also expressly noted on the record, both at the final pretrial conference and at trial, that it had engaged in the full Rule 403 analysis in admitting the evidence.  (ECF 473 at Tr. 25-26; ECF 487 at Tr. 98.)

        c.   <u>The Limiting Instruction Mitigated Any Prejudice to Defendant.</u>

The Court instructed the jury on the limited use that may be made of defendant's prior conviction.  (ECF 487 at Tr. 86-97.)  After Guzman's testimony about Lester knowing defendant from their time in prison together, the Court immediately instructed the jury, "[T]he fact that Mr. Lopez Castro may have been convicted of a prior crime may only be considered by you as relating to the background of the charged conspiracy. . . . The prior conviction is not evidence of the existence of the charged conspiracy or membership by anyone in the charged conspiracy."  (<u>Id.</u> at Tr. 150-51).  The Court reminded the jury of the limited purpose of the prior conviction after Guzman's testimony concluded as well.  (ECF 489 at Tr. 255).  These instructions were repeated during the final jury charge.  (ECF 493 at Tr. 580.)

Defendant argues that the government's references to his prior conviction during its closing argument were prejudicial despite the Court's limiting instruction.  The government responds by asserting that, in its summation, it referenced the prior conviction "in the context of corroborating the testimony" of Guzman and that it reminded the jury that the conviction related only to the background of the conspiracy and that the prior conviction was not proof of the charged conspiracy "at all."  (ECF 563 at 4.)  A review of the government's summation places each of the references objected to by defendant into context and shows that they were permissible uses under the Court's basis for admission of the prior conviction.

Although defendant objects to the government's reference to him as a "drug trafficker" during its summation, several uses of that term are clearly in reference to the instant conspiracy and do not reference his prior conviction. (See ECF 493 at Tr. 512, 513, 515.) The government's reference to defendant "get[ing] back to work" and resuming drug trafficking after getting out of jail for his prior conviction explicitly connects that statement to the relationship among himself, Lester, and Guzman—the permissible basis for the admission of the fact of the prior conviction. (Id. at Tr. 529 ("And that's why the defendant sought out [Guzman] when he got out of jail and was ready to get back to work, because Lester vouched for [Guzman]. As I said, Lester had trafficked drugs with [Guzman] before. And he knew [Guzman] was a person who could get the defendant's cocaine to the East Coast. . . ."); id. at Tr. 531.) The government also referred to Guzman's testimony about his first meeting with defendant, discussing the background of their relationship and explicitly making clear that defendant was joining Guzman and Lester's ongoing drug trafficking conspiracy—not that defendant was continuing his own drug trafficking scheme for which he had previously been convicted. (Id. at Tr. 529-30.) The government also referenced what Guzman had testified to about defendant's "past and about his cocaine trafficking connections, because the defendant confided in [Guzman]" about, for example, trying to end his supervised release early so he could travel to the Dominican Republic; here, too, the government referenced the fact of the prior conviction and termination of supervised release to corroborate Guzman's testimony. (Id. at Tr. 531.)

The government referenced the court records admitted into evidence about "defendant's prior conviction for trafficking cocaine from Puerto Rico to New York." (Id. at Tr. 534.) The government stated: "Now, as Judge Castel has said to you during the course of this trial, this prior conviction is not proof of the existence of the conspiracy the defendant is charged

with here at all, but it is important.  We discussed it at this trial because it helps to explain the background of the charged conspiracy."  (Id.)  The government then continued, focusing on defendant's early termination of supervised release: "You heard from [Guzman] that the defendant was going to try to end his probation early, that he filed a motion in early 2021.  And you've seen the court records showing that the defendant in fact followed through on that plan."  (Id. at Tr. 534-35.)  The government's reference to defendant wanting to terminate his supervised release so he could "travel and meet with others about his continued cocaine trafficking" was also made in the context of Guzman's testimony and the background of the conspiracy.  (Id.)

The government also referred several more times during summation to defendant's prior "experience" trafficking cocaine and his prison sentence for it, always in the context of joining Guzman's "network" or "connecting" with Guzman—again directed toward the relationship and development of trust between them.  (Id. at Tr. 536-37, 544.)  The record shows, then, that the government's references to the prior conviction and early termination of supervised release during summation were proper and done in accordance with the basis on which the Court originally admitted this evidence.

2.    The Verdict was Not Against the Weight of the Evidence.

A court "[g]enerally . . . has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29."  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (citing United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)). Defendant argues in effect that the verdict should be set aside in the interests of justice because it was against the weight of the evidence.  The Court disagrees.

A jury may convict on circumstantial evidence alone.  United States v. Irving, 452 F.3d 110, 117 (2d Cir. 2006).  Courts must "defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses."  United States v. LeRoy, 687 F.2d 610, 616 (2d Cir. 1982) (citation omitted).  Moreover, "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand."  United States v. Archer, 977 F.3d 181, 187-88 (2d Cir. 2020) (citing Sanchez, 969 F.2d at 1413).

Defendant's arguments emphasize his view that the government's case was circumstantial except for the testimony of Guzman and that Guzman was a single cooperating witness unworthy of belief.  The Court found Guzman's testimony to be credible and well-corroborated by contemporaneous shipping records and data stored on phones.  The Court has reviewed the evidence in connection with the Rule 29 sufficiency argument and need not do so again.  It suffices to state that there was no miscarriage of justice in the jury's unanimous verdict finding defendant guilty of participating in the drug trafficking conspiracy.

3.    Defendant's Constitutional and Statutory
       Speedy Trial Rights Were Not Violated.

Defendant argues that the charges against him should be dismissed with prejudice for violations of his constitutional and statutory speedy trial rights. The Court denied defendant's motion prior to trial, and defendant urges the Court to "revisit" its denial of his motion.  (ECF 447; ECF 473.)  In its bench ruling, the Court analyzed defendant's claim of a violation of his right to a speedy trial under both the Sixth Amendment and the Speedy Trial Act.  (ECF 473.) The Court revisits that analysis here.

a.  Defendant Was Not Deprived of His
Constitutional Right to a Speedy Trial.

The Sixth Amendment protects the "right to a speedy and public trial, by an impartial jury. . . ."  U.S. Const. Amend. VI.  The constitutional right to a speedy trial is "'fundamental' and is imposed by the Due Process Clause of the Fourteenth Amendment on the States."  Barker v. Wingo, 407 U.S. 514, 515 (1972) (citation omitted).  The Supreme Court has identified four factors a district court must balance when determining whether a defendant's constitutional speedy trial right has been violated: the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.  Id. at 530.

Evaluating these factors, the Court concludes that defendant's constitutional right to a speedy trial was not violated.  First, the length of delay acts as a "triggering mechanism" for the remaining factors.  Id.  A district court must look at the circumstances of the case to see if the length of the delay was long enough to be "presumptively prejudicial."  Id.; United States v. Moreno, 789 F.3d 72, 78 (2d Cir. 2015) (citation omitted).  Once this first factor is satisfied, the length of delay must be considered alongside all the other Barker other factors.  See Barker, 407 U.S. at 533 ("We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant.").

"[A] post-accusation delay approaching one year may be considered presumptively prejudicial."  United States v. Black, 918 F.3d 243, 255 (2d Cir. 2019) (citing Doggett v. United States, 505 U.S. 647, 652 n.1 (1992)).  The constitutional right to a speedy trial "attaches at arrest—not when formal charges are filed."  Id. at 256.  Here, defendant was arrested on September 1, 2022, and his trial began on November 6, 2023.  A span of one year and

two months is enough to trigger the remaining factors in the <u>Barker</u> inquiry, although the Second

Circuit has found no violation in cases with much longer delays.  <u>See</u> <u>Flowers v. Warden,</u>

<u>Connecticut Correctional Institution, Somers</u>, 853 F.2d 131, 133 (2d Cir. 1988) (collecting

cases).  Still, this threshold element has been met.

   The reason for the delay is also dependent on the specific circumstances.

"Neutral" reasons for delay, "such as negligence or overcrowded courts[,] should be weighted

less heavily" than more nefarious reasons, such as deliberate delay by the government.  <u>Barker</u>,

407 U.S. at 531.  The Second Circuit has found that an individual's Sixth Amendment right is

"'rarely violated' . . . if the delay 'serves some legitimate government purpose' such as time to

collect witnesses, oppose pretrial motions, or to track down a defendant if he goes into hiding."

<u>United States v. Cabral</u>, 979 F.3d 150, 158 (2d Cir. 2020) (citations omitted).

   Each adjournment or delay in defendant's case had a legitimate government

purpose.  There is no evidence that the government intentionally delayed the process "to gain

some impermissible advantage at trial."  <u>Doggett</u>, 505 U.S. at 656.  Rather, the delays were

associated with the voluminous amount of discovery and the overall complexity of the case; the

government charged nine other individuals between June 11, 2019 and the filing of the S12

Superseding Indictment on August 23, 2022.  (ECF 563 at 23.)  Further, the investigation

produced an immense amount of data that both the government and the defense had to review.

(ECF 439 at Tr. 4-6.)  There was one instance the Court delayed a conference due to scheduling,

as discussed below, but that period of nine days is not unreasonable or caused by an illegitimate

government purpose.  Under these circumstances, the reasons for these delays—with the possible

exception of nine days—weigh in favor of the government, as the delays were reasonable and not

attributable to negligence, overcrowded dockets, or an attempt to gain an impermissible advantage.

A defendant's assertation of his speedy trial right "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." Barker, 407 U.S. at 531-32. This factor heavily favors defendant, who has asserted his right to a speedy trial many times since his arrest. During the October 6, 2022 arraignment, his first appearance in this Court, defendant's counsel made a point to emphasize his desire for a speedy trial. (ECF 453 at 3.) At almost every court appearance thereafter, the defense objected to the exclusion of time through to the next conference date. Thus, this factor weighs in favor of defendant.

The final balancing factor is the prejudice of the delay on the defendant. This factor "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." Barker, 407 U.S. at 532. These interests are "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Id. (footnote omitted). The third factor is "the most serious . . . because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id. Defendant has failed to show that any actual prejudice resulted from the delay. The Second Circuit has held that longer periods of pretrial incarceration than that experienced by defendant have not been prejudicial. See United States v. Fasanaro, 471 F.2d 717, 718 (2d Cir. 1973) (finding no speedy trial violation or prejudice after more than four years of pretrial incarceration). As to the second factor, every defendant faces some level of anxiety and "adverse psychological effect[s]." United States v. Saglimbene, 471 F.2d 16, 18 (2d Cir. 1972). The defense has made no claims of excess anxiety throughout this pretrial time period.

Defendant has not produced examples of how his defense was impaired by the delay, such as missing witnesses, loss of memory, or other evidence that would have been affected.  See Cabral, 979 F.3d at 165 (citations omitted) (finding that fourth Barker factor weighed against defendant where he did not "articulate in any way why this [missing] individual would have had exculpatory information that would be helpful to [him]," because "[t]o satisfy his burden of demonstrating actual prejudice, [defendant] was required to explain to the district court why this individual's testimony . . . would have been relevant to some defense on the charge in the indictment," and where defendant's "generalized claim of memory problems" about the events in question was "not sufficient for a defendant to show the required 'specific prejudice to his defense'").

The Court concludes that, on these facts, the interval of one year and two months between defendant's arrest and the commencement of his trial did not deprive defendant of his Sixth Amendment right to a speedy trial.

b.  Defendant's Rights Under the
Speedy Trial Act Were Not Violated.

Defendant also asserts that his rights under the Speedy Trial Act were violated. Prior to trial, defendant moved to dismiss under the Speedy Trial Act, and in a bench ruling, the Court explained in considerable detail why the motion was denied.  (ECF 473 at Tr. 6-14.)  The Court adheres to its prior ruling.

The Speedy Trial Act requires that a trial must "commence within 70 days of the indictment or arraignment thereon, whichever occurs later," but certain periods of time may be excluded from that 70-day clock.  See United States v. Kelly, 45 F.3d 45, 47 (2d Cir. 1995) (citing 18 U.S.C. § 3161(c)(1), (h)).  "[C]ases involving multiple defendants are governed by a

single speedy trial clock, which begins to run with the clock of the most recently added defendant, and . . . delay attributable to any one defendant is charged against the single clock, thus making the delay applicable to all defendants." United States v. Pena, 793 F.2d 486, 489 (2d Cir. 1986) (citations omitted). Finally, the filing of a superseding indictment tolls the speedy trial clock until the defendant's "first judicial appearance" on the superseding indictment. Kelly, 45 F.3d at 48.

Defendant was arrested on a criminal complaint on September 1, 2022 and made an initial appearance before Magistrate Judge Willis on September 2, 2022. (Minute Entry 9/2/2022.) On September 27, 2022, the S13 indictment charging defendant was filed, and on October 6, 2022, he was arraigned before Magistrate Judge Gorenstein. (ECF 321; ECF 453.) Before defendant's arraignment, at a conference on September 7, 2022 attended by only defendant Nieves Perez, who was also named in the S13 indictment, the government described the volume of discovery to be produced as exceeding two terabytes (ECF 341 at Tr. 2) and cited the circumstance that two co-defendants had not yet appeared in the district (id. at Tr. 2-3) and sought an exclusion of time until a conference to be held on December 13, 2022, which the Court granted. (Id. at Tr. 2-5.) Under the single speedy trial clock rule, this exclusion of time applied to defendant.

On October 20, 2022, the S14 superseding indictment was filed; the Court excluded time, on the government's motion, until December 13, 2022, the exclusion date set on the S13 indictment. (ECF 343; ECF 357.) The government moved to adjourn the December 13 conference until January 24, 2023 and to exclude time until then for three reasons: the Court was commencing a trial against a defendant charged in an S15 indictment on December 12, 2022;[3]

---

[3] An earlier trial against this defendant, Abel Montilla, had resulted in a mistrial when a government witness tested positive for Covid-19. The Court acknowledges that court congestion is not alone a valid reason for a speedy trial

production of discovery and review by defense counsel was ongoing; and the extension would permit discussion of pretrial resolutions of the case with two co-defendants. (ECF 370; ECF 373; ECF 379.) The Court excluded time until January 24, 2023. (ECF 373.) Defendant and his co-defendants were arraigned on the S14 superseding indictment at the January 24, 2023 conference. (ECF 402.) The single speedy trial clock as to all defendants was tolled until January 24, 2023, when defendant, Nieves Perez, and Colon were all arraigned on the S14 superseding indictment. (Id.)[4]

        Defendant argues that because the S14 indictment only added a new defendant and did not add a new count against him, it did not restart the speedy trial clock as to him. (See ECF 343; ECF 565 at 8.) For this proposition, defendant principally relies on Kelly.

        But Kelly involved only a single defendant and does not stand for the proposition that in a multidefendant case, the speedy trial clock is only restarted by a superseding indictment that adds a new charge specific to the defendant asserting a speedy trial right. Kelly, 45 F.3d at 47-48. The grand jury had the right to charge Sanjurjo, who had not been named in the S13 indictment, as a participant in the charged conspiracy in the S14 indictment naming both Sanjurjo and defendant. The decision to do so rendered Sanjurjo and defendant subject to the same speedy trial clock. Pena, 793 F.2d at 489.[5]

        Second, defendant argues that "[s]uperseding indictments do not stop the clock." (ECF 547 at 14.) As support for that statement, he cites Gambino, 59 F.3d at 362. But in

---

exclusion. But the pandemic—not calendar congestion—caused the needed for a retrial and hence the Court's lack of availability on December 13. Even at that, the exclusion was based upon two other independent reasons.

[4] The government states in its November 2022 letter than Sanjurjo had already been arraigned on the S14 indictment (ECF 350 at 2) and repeats this assertion in its opposition brief (ECF 563 at 14). A minute entry reflects that on November 4, 2022, Sanjurjo was arraigned. The record also reflects that Sanjurjo was arraigned again on the S14 indictment, along with Lopez Castro, Colon, and Nieves Perez, at the January 24, 2023 conference. (ECF 402 at Tr. 3-4; Minute Entry, 1/24/2023.)

[5] Polanco v. United States, 2000 WL 1072303 at *8 n.4 (S.D.N.Y. Aug. 3, 2000) (Haight, J.), also cited by defendant, was also a single defendant case.

Gambino, the defendant's case was joined "belated[ly]" with new co-defendants in a superseding indictment only after the defendant's speedy trial right under the original indictment had already been violated; the Court held in that instance that such joinder would not "effectively reset[]" the defendant's speedy trial right in that case.  Id.  As defendant concedes, his speedy trial clock had not expired at the time that Sanjurjo was added in the superseding indictment.  (ECF 547 at 16-17.)  Gambino is thus inapposite.

Defendant also cites Gambino for the proposition that "a superseding indictment inherits the clock of the original indictment," (ECF 547 at 14-15), but he cites this statement out of context.  In Gambino, the Court dealt with a situation where "the original indictment's time on the speedy trial clock has run out, but in the meanwhile a superseding indictment has been filed by the time defendant moves for dismissal of the original indictment."  Id. at 362.  The Court concluded that "[a] superseding indictment inherits the clock of the original . . . so that any violation of the original is imputed to it," and that "consequently it is the later indictment that must be dismissed" rather than the original indictment.  Id. (citing United States v. Roman, 822 F.2d 261, 265-66 (2d Cir. 1987)).  More relevant to defendant's argument is the Second Circuit's explanation in Kelly "that exclusions granted under the original indictment apply to charges carried over in a superseding indictment."  Kelly, 45 F.3d at 48 (citing Roman, 822 F.2d at 263-64).  Therefore, the exclusions of time made as to the S13 indictment were "inherited" by the S14 indictment—and the government, in an abundance of caution, also moved for the same exclusion under the S14 indictment after it was filed.  (ECF 350.)

The Court concludes that time was validly excluded up through the date that the last co-defendant in this action was arraigned, i.e., January 24, 2023.  The Court now turns to

briefly review the exclusions of time between January 24, 2023 and the start of Lopez Castro's trial on November 6, 2023.

At the January 24 conference, the Court excluded time, on the government's motion, through May 2, 2023, finding that this exclusion was necessary for the government's stated reasons: to "prepare discovery, produce discovery, continue to review discovery, to permit defense time to review that discovery, and to allow time for the parties to discuss potential pretrial resolutions in this case."  (ECF 402 at Tr. 12-14.)

The Court then adjourned the May 2, 2023 conference to May 12, 2023 due to the Court's schedule, and excluded time until May 12, 2023, later moving the conference forward a day to May 11, 2023.  (ECF 430, 431.)  Under 18 U.S.C. § 3161(h)(7)(C), "no continuance . . . shall be granted because of general congestion of the court's calendar."  Assuming that the days from May 2 to May 11 were not excludable, it would only account for nine out of the allotted 70 days of non-excludable time before trial.

The Court subsequently excluded time from May 11, 2023 to September 7, 2023 in order to allow time for the completion of the production of discovery and to allow defense counsel time to evaluate the discovery and to decide whether or not to bring motions, as well as for the parties to engage in pretrial discussions.  (ECF 439 at Tr. 13-15.)  No party objected to the exclusion of time from May 11 to September 7, 2023; in fact, counsel for defendant stated on the record that he did not object to an exclusion for the purposes of evaluating whether to bring a motion regarding the speedy trial clock, a potential severance motion, and a motion to suppress electronic communications, noting that an "immense amount of data" had been produced.  (Id. at Tr. 3-5, 14).

During the September 7, 2023 conference, Lopez Castro's counsel stated that he planned to move to dismiss the indictment on speedy trial and sufficiency of the evidence grounds and to move for severance. (ECF 456 at Tr. 5-9.) The Court thus granted the government's motion for an exclusion of time from September 7, 2023 to the November 6, 2023 trial date, finding that "the time is needed to enable one defendant [Lopez Castro] to make certain motions, for the government to make its motions in limine as to all defendants, for all defendants to respond, and for the government to reply, for the Court to hold a final pretrial conference, and for the parties to prepare for trial or change of plea proceedings." (Id. at Tr. 12-13.) Defendant counsel stated that he did not object to the government's motion to exclude time, "[s]ubject to the arguments already advanced." (Id.) Thus, each of the exclusions of time from January 24, 2023 to November 6, 2023 were validly granted.

Separately, the time between defendant's September 21, 2023 filing of a motion to dismiss and the hearing on that motion on October 26, 2023 is also excludable under section 3161(h)(1)(F) of the Speedy Trial Act. See Henderson v. United States, 476 U.S. 321, 326 (1986) (quoting 18 U.S.C. § 3161(h)(1)(F)).

Defendant's remaining arguments are principally about the "reasonableness" and sufficiency of the Court's reasons for granting exclusions of time throughout the case, including that the Court's reasons for granting the exclusions of time up to January 24, 2023 were "boilerplate" or "devoid of any case specific reasons" and therefore insufficient. (ECF 547 at 17-18.) Defendant also attacks the speed with which the government produced discovery, thus necessitating these exclusions. (Id. at 18.) Defendant may not successfully challenge the reasonableness of delay occasioned by the production of discovery materials that, as here, became more voluminous because of joinder with co-defendants, because he did not move for

severance.  See United States v. Vasquez, 918 F.2d 329, 335-37 (2d Cir. 1990) (holding that the statute "requires a defendant to move for severance before he can invoke the reasonableness requirement as to delays occasioned by his joinder with a co-defendant").[6]

Although defendant's counsel stated at several pretrial conferences that he intended to move for severance (ECF 439 at Tr. 3-5, 14; ECF 456 at Tr. 5-9), he acknowledged at the final pretrial conference that he had never made such a motion.  (ECF 473 at Tr. 2-3.)[7]

The Court concludes that defendant's speedy trial rights were not violated and adheres to its decision to deny his motion to dismiss the indictment on those grounds.

The Court therefore will deny defendant's Rule 33 motion.

CONCLUSION

Defendant's motion is DENIED.  The Clerk of Court is respectfully requested to terminate the motion (ECF 547).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        August 29, 2024

---

[6] Defendant argues that his failure to move for a severance ought not impact his speedy trial rights and that it was incumbent upon co-defendants who wished to proceed at a slower pace to move for a severance.  (ECF 565 at 6.) But it was defendant's burden to demonstrate that a joint trial would prejudice him.  See, e.g., Zafiro v. United States, 506 U.S. 534, 539-41 (1993).  Defendant also cites no authority for his argument that a defendant cannot waive his right to a speedy trial by refraining from making a severance motion.  (ECF 565 at 5.)  These arguments are inconsistent with the holding of Vasquez, 918 F.2d at 335-37.

[7] The defense also sought an evidentiary hearing to compare the quantum of evidence against defendant with that against his co-defendants.  (Id. at Tr. 3-4.)  This request to preview the government's entire case against his client and compare it to the evidence against other defendants was, so far as defense counsel was aware, unprecedented in this district.  Unprecedented or not, it was unwarranted.